FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

99 MAR 29 AM 11: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

MELANIE AKERS,                    }
                                  }
        Plaintiff,                }
                                  }
v.                                }        CASE NO. CV 96-B-2599-J
                                  }
BUCCANEER HOMES OF                }
ALABAMA,                          }
                                  }        **ENTERED**
        Defendant.                }
                                  }        MAR 2 9 1999

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment of defendant Buccaneer

Homes of Alabama ("Buccaneer"). Plaintiff Melanie Akers ("Akers") brought this suit alleging

gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

Akers also alleges violations of her rights under the anti-retaliation provisions of Title VII. Akers

further alleges state law claims of assault and battery, invasion of privacy, and intentional infliction

of emotional harm. Upon consideration of the record, the submissions of the parties, the

argument of counsel, and the relevant law, the court is of the opinion that Buccaneer's motion is

due to be granted.

## I. FACTUAL SUMMARY

Melanie Akers began working for Buccaneer, a housing manufacturer, as a molder on

May 23, 1995. (Akers Dep. at 71). Upon Akers's arrival at her new job, she was presented with

Buccaneer's Employee Handbook and a document which contained Buccaneer's sexual

harassment policy. (*Id.* at 71-74). Akers read and signed the handbook and the document which

contained Buccaneer's sexual harassment policy. (*Id.* at 71-76). Buccaneer's sexual harassment

policy states that complaints of sexual harassment should be made to its Controller, Dale Gilliland ("Gilliland"), or alternatively, to its President, Charles Dempsey ("Dempsey"). (Defendant's Exh. 3 to Akers Dep.).

On November 11, 1995, Akers received a "bushwa" from production worker Dwight Hicks ("Hicks"). (Akers Dep. at 177). Akers described this "bushwa" as an incident where Hicks "lifted me up off the ground and thrusted himself up against my rear end for about thirty seconds." (*Id.* at 177). Hicks, production worker Wade Nichols ("Nichols"), and Terry Williams, another production worker, had been known by others around the plant to "bushwa" each other and other men. (Nunn Dep. at 170-73). The following Monday, Akers reported this incident to her foreman, Tim Nunn ("Nunn"). (Akers Dep. at 182-83). Nunn then verbally reprimanded Hicks and ordered him to never "bushwa" or in any way harass Akers again. (Nunn Dep. at 191-92). Nunn did not report the incident to Gilliland. (*Id.* at 183). However, Nunn did report the conduct to Production Supervisor Don Kelly ("Kelly") within a week or two of its occurrence. (*Id.* at 185).

Akers testified that she had only one other run-in with Hicks. (Akers Dep. at 184). Several days after the "bushwa" incident, plaintiff alleges that Hicks threatened to "do you like I did you on that Saturday, and then he slapped [her] on the butt with a piece of molding."[1] (*Id.*). However, Akers did not report this incident to anyone at Buccaneer. (*Id.* at 187). Plaintiff alleges that on two previous occasions she was subjected to sexual harassment by employees of Buccaneer. An unknown employee drew two circles on plaintiff's time card and wrote "big tits." (*Id.* at 252). However, Akers did not report this incident to anyone. (*Id.*). On another occasion,

---

[1]Hicks denied that this incident ever occurred. (Hicks Dep. at 203-04).

2

Nunn received a birthday cake that was shaped like a woman with big breasts. (Nunn Dep. at 249). Nunn made a comment to Akers about her resemblance to the cake. (*Id.* at 249-50; Akers Dep. at 164). There is no evidence on the record indicating that Akers ever reported this incident to anyone at Buccaneer.

On March 1, 1996, plaintiff received a reprimand for standing on the top rung of the ladder. (Def.'s Exh. 4 to Akers Dep.). Akers protested this reprimand claiming that she had previously ordered a ladder tall enough to complete her task and the request had been ignored. (*Id.*). However, Nunn stated that Akers had asked for a smaller ladder because it would not have been as heavy. (*Id.*).

On March 26, 1996, Gilliland received an anonymous phone call advising him that Akers and Hicks had an incident which he should look into. (Gilliland Dep. at 102). Gilliland then called Nunn and Kelly to his office to discuss the incident. (*Id.* at 106). Nunn told Gilliland what had happen and of the corrective action which he had taken. (*Id.* at 107). Gilliland then called Akers into his office to discuss the incident. (*Id.* at 108-09). Akers described the "bushwa" incident to him. (*Id.*; Akers Dep. at 232-33). Gilliland testified that this was the first time he ever heard the term "bushwa." (Gilliland Dep. at 108). He told Akers that he would investigate the incident. (Akers Dep. at 233). Next, Gilliland called Hicks to his office to discuss the "bushwa" incident. (Gilliland Dep. at 121). Hicks was given a written warning by Gilliland, in which he was ordered to leave Akers alone. (*Id.* at 122-23).

Subsequently, Gilliland called Akers back into his office and offered to transfer her to another position in the plant or to a different Buccaneer plant. (Akers Dep. at 216; Gilliland Dep. at 128-29). Plaintiff decided to remain where she was. (Akers Dep. at 216-17). Gilliland then

3

prepared a written reprimand which stated that Hicks was to be moved to the cabinet set area and that if any further actions towards Akers followed, he would be immediately terminated. (Gilliland Dep. at 132-33).

On May 8, 1996, Akers filed a Charge of Discrimination with the EEOC. (Akers Dep. at 229, Def.'s Exh. 7). In this charge, plaintiff contends that she was subject to unwelcome sexual harassment by her supervisor, Dwight Hicks. (*Id.*). Plaintiff accuses Hicks of "continually and forcefully sexually harass[ing] [her] in spite of [her] continual protests and attempts to repel his sexual advances." (*Id.*). Akers further alleges that the sexual harassment imposed on her included both quid pro quo sexual harassment and a hostile working environment. (*Id.*). However, Akers acknowledges that Hicks was not her supervisor at the time of the two incidents of harassment. (Akers Dep. at 186).

After plaintiff had complained about the "bushwa" incident with Hicks, Akers complained about harassment from another employee, Sandra Dailey ("Dailey"). (*Id.* at 195). Dailey, in Akers's presence, told a male employee "don't touch me, sexual harassment, sexual harassment," in an apparent attempt to ridicule the plaintiff. (*Id.*). Akers reported this incident to Kelly who then took the plaintiff to Gilliland's office. (*Id.* at 195-96). Gilliland assured the plaintiff that he would speak to Dailey in order to ensure that she would not give Akers any more trouble. (*Id.* at 196).

In September 1996, plaintiff complained about the cleaning fumes in the short molding area. (Akers Dep. at 152). Since she was pregnant, Akers requested that the cleaning women be moved to another station. (*Id.*). Instead, she was transferred to the molding station by Nunn. (*Id.*). Akers claims that moving her, instead of the cleaning women, was intentionally done in

4

order to harass her. (*Id.* at 152-53). In late September, plaintiff was given a reprimand for leaving the plant without permission. (Def.'s Exh. 5 to Akers Dep.).

On November 26, 1996, Akers reported an on-the-job injury to her right hand. (Akers Dep. at 87, Def.'s (second) Exh. 1). The injury precluded her from continuing to work in molding or from doing any job which required repetitive use of her right hand. (Akers Dep. at 127). Thus, plaintiff was reassigned to the light duty position of cleaning counter tops and bathtubs with her left hand only. (*Id.* at 352-53).

In early December 1996, Akers was re-assigned to another light duty position. (Gilliland Dep. at 117). This position required her to stain molding. (*Id.*). This was only a temporary assignment because the position required puttying and tack-up, which Akers could not do. (Gilliland Dep. Vol. 2 at 39-40).

Initially, Akers was temporarily reassigned to vacuuming until it was discovered that she could not lift the vacuum with one hand. (*Id.* at 51-52). Then, Akers was assigned to the tool room, sorting nails and screws. (Gilliland Dep. at 163). However, plaintiff did not like this position because other employees were teasing her for sitting down all day in this light duty position. (*Id.*). Akers was then moved to picking up trash in the yard. (Akers Dep. at 117-18). While in this assignment, plaintiff was given indoor work on rainy days. (*Id.*). Akers did not like this job and complained about it several times. (*Id.* at 122-124, 364). Akers claims that she was the only employee picking up trash who was required to go outside the gate and pick up garbage on the street. (*Id.* at 409-10). While in this clean-up position, plaintiff complained that it might require her to come into contact with Hicks. (*Id.* at 137). In order to avoid such contact, Gilliland instructed Akers not to clean beyond a certain point. (Gilliland Dep. at 156-57).

5

In February 1997, plaintiff was assigned to the sheet rock area, picking up sheet rock and inspecting tile for cuts. (Akers Dep. at 366-67). While in this position, plaintiff was verbally reprimanded on one occasion for smoking instead of doing her job. (*Id.* at 391). Akers believes that this action was in retaliation for her sexual harassment claim because other employees who were smoking with her were not reprimanded. (*Id.* at 391-92).

On May 29, 1997, Gilliland met with Akers in order to give her a warning for excessive absenteeism. (Gilliland Dep. Vol. 2 at 92). Plaintiff responded by presenting to Gilliland her pre-prepared letter of resignation which cited health and personal reasons. (Akers Dep. at 404-05, 414-15). Akers explained the personal reason she noted in her letter was that "[w]hat I had gone through for the past year and a half since I had filed the case put a strain on my marriage and my personal life." (*Id.* at 407). Plaintiff stated that the "one thing that sticks out in my mind that upsets me more than anything else," was being placed on garbage detail. (*Id.* at 408-09). Akers claims that she was "required to go down to Buccaneer Street and pick up trash in the parking lot," while others on garbage detail were not required to do so. (*Id.* at 409). Gilliland told her that the written warning would be withdrawn if she would obtain medical certification that would entitle her to Family and Medical Leave Act status for the absences in question. (*Id.* at 416-418).[2] Akers refused this offer and resigned instead. (*Id.* at 419-20).

In support of her retaliation claim, Akers cites many instances of alleged retaliatory conduct by employees of Buccaneer. Plaintiff alleges that fellow employees were unkind to her and refused to work with her. (*Id.* at 462). An employee called plaintiff at home to tell her that

---

[2]Gilliland testified that he expressly gave the plaintiff an opportunity to rescind her resignation. (Gilliland Dep. Vol 2 at 85). However, Akers does not remember Gilliland expressly telling her this. (Akers Dep. at 419).

6

she had ben the cause of a rule change that required shorts to be of a certain length. (*Id.* at 378-80). Furthermore, she alleges that Nunn was rude to her and teased her about the incident with Hicks. (*Id.* at 157, 207). Plaintiff also claims that Nunn would give her difficult jobs and require her to complete extra work. (*Id.* at 158-59).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable*

7

inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Sexual Harassment

Title VII of the Civil Rights Act of 1964, as amended, prohibits employer discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The law recognizes two varieties of sexual harassment: quid pro quo sexual harassment and hostile work environment sexual harassment. *Steele v. Offshore Shipbuilding, Inc.*, 867 F. 2d 1311, 1315 (11th Cir. 1989); *Henson v. City of Dundee*, 682 F.2d 897, 908 n.18 & 910 (11th Cir. 1982). Quid pro quo sexual harassment "occurs when an employer alters an employee's job conditions as a result of employee's refusal to submit to sexual demands." *Steele*, 867 F.2d at 1315. Hostile environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Steele*, 867 F.2d at 1315.

### 1. Quid pro quo sexual harassment.

Akers, in her EEOC charge and her complaint, claims to have suffered from quid pro quo sexual harassment. As noted above, quid pro quo sexual harassment "occurs when an employer alters an employee's job conditions as a result of employee's refusal to submit to sexual demands." *Steele*, 867 F.2d at 1315. An employer is strictly liable for quid pro quo sexual harassment because "[w]hen a supervisor **requires sexual favors** as a *quid pro quo* for job

8

benefits, the supervisor by definition, acts as the company." *Id.* at 1316 (emphasis added). "In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo*." *Henson,* 682 F. 2d at 910; *Steele,* 867 F.2d at 1316.

The gravamen of a quid pro quo claim is that a plaintiff is presented with a choice of acceding to sexual demands to gain or avoid losing some job benefit or promotion, or refusing the sexual demands and suffering the consequences. Here, plaintiff simply was not presented with any such bargain. Plaintiff has presented no evidence of sexual blackmail or extortion of "something for something." Neither Hicks nor any other employee of Buccaneer ever demanded sexual favors from plaintiff as quid pro quo for jobs benefits. Furthermore, submission to sexual conduct was never a term or condition of plaintiff's employment. In fact, it is undisputed that neither Hicks nor any other employee of Buccaneer ever demanded sexual favors from Akers. Thus, plaintiff has no viable quid pro quo sexual harassment claim.

## 2. Hostile environment sexual harassment

An employer may be liable for subjecting an employee to a hostile work environment if an employer's conduct "'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Vinson,* 477 U.S. at 65 (citation omitted); *Steele,* 867 F.2d at 1315. Hostile work environment sexual harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510

9

U.S. 17, 21 (1993) (internal citations omitted); *Cross v. Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995). The conduct at issue must be severe or pervasive enough to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris*, 510 U.S. at 21. Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson*, 682 F.2d at 904. In addition, whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

To establish a prima facie case of hostile working environment, a plaintiff must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome harassment; (3) that the harassment complained of was based on sex; and (4) that the harassment affected a term, condition, or privilege of the complainant's employment in that it was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Henson*, 682 F.2d at 904. Akers has satisfied the first three elements of the prima facie case. Plaintiff is a female who was subject to unwelcome harassment based upon her sex. However, plaintiff's claim of hostile environment sexual harassment fails because, as a matter of law, the harassment was not sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive environment.

Plaintiff experienced four separate incidents which could reasonably be viewed as evidence of sexual harassment; (1) she was given a "bushwa" by Hicks; (2) Hicks slapped her bottom with a piece of molding and threatened to "bushwa" her again; (3) Nunn commented that the plaintiff resembled a cake shaped like a female with big breasts; and (4) an unknown person drew breasts on her time card and wrote "big tits." In support of her hostile working environment sexual harassment claim, plaintiff cites incidents involving persons other than Akers. However, there is no evidence that Akers knew of these incidents prior to conducting discovery in this case. In order for a hostile environment claim to succeed, the plaintiff must subjectively view the environment as hostile. *Edwards*, 49 F.3d at 1522. Thus, any incident which plaintiff did not have knowledge of prior to discovery in this case is irrelevant for the purposes of deciding whether the level of harassment which Akers suffered was sufficiently severe and pervasive so as to alter the conditions of her employment and create a hostile working environment.

In *Morrow v. Auburn Univ. at Montgomery*, 973 F. Supp. 1392 (M.D. Ala. 1997), a plaintiff alleged conduct much more severe and pervasive than the harassment alleged in this case and still failed to persuade the court that the conduct was actionable sexual harassment. Morrow alleged that her supervisor repeatedly engaged in harassing conduct towards her, including inappropriate contact and comments over a period of five years. *Id.* at 1403-04. The plaintiff complained to the Dean about this conduct by her supervisor, but the supervisor did not cease the

11

inappropriate conduct.[3] *Id.* at 1398, 1404. The court held that while "such conduct is unprofessional and disrespectful," it "was not sufficiently severe and pervasive to be actionable under Title VII." *Id.* at 1404.

The conduct which is the primary subject of the plaintiff's complaint is the harassment perpetrated by Hicks. Yet, plaintiff also mentions two other instances which she considers to be sexual harassment, the comment by Nunn and the drawing on the timecard. All four acts of harassment are undeniably inappropriate. Plaintiff reported only one of these incidents to Gilliland. Once Gilliland was made aware of this conduct he transferred Hicks from the plaintiff's working area and no such conduct occurred again. Plaintiff was not regularly harassed, as was the plaintiff in *Morrow*, but rather she was the victim of four isolated incidents. When viewed separately or collectively, plaintiff's allegations do not rise to the level of being so severe and pervasive as to alter the conditions of her employment and create an abusive atmosphere.

---

[3]In *Morrow*, the specific allegations of the plaintiff were as follows:
> [P]laintiff alleges that her work environment was hostile because of Denton's demeaning and condescending references and conduct toward her. Specifically, plaintiff complains that . . . Denton patted her on her rear with a ruler "in public;". . . Denton put his arm around her shoulder and rubbed the back of her neck in front of the students in the lab; . . . Denton intentionally stood close behind her in "a rude fashion" when she was standing in front of a supply closet; . . . Denton attempted, teasingly, to soil her shoes in front of her colleagues; Denton referred to her in diminutive terms such as "teeny bopper" "little scientist" and "warm lady" in front of her colleagues and students and often made comments about her figure including . . . how she lost weight and regained her figure after a pregnancy; and counseled plaintiff to "work her charms" and be "everybody's little darling" to get support for tenure among her colleagues. According to plaintiff, after November 1993, Denton purposely tried to embarrass her and make her feel uncomfortable.

*Morrow*, 973 F. Supp. at 1403-04.

12

Even if plaintiff had established a prima facie case of hostile work environment sexual harassment, her claim still would fail. In order for a hostile environment sexual harassment claim to succeed, in addition to demonstrating a hostile environment, the plaintiff must also establish liability on the part of the employer for the harassment perpetrated by its employees. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, __, 118 S.Ct. 2257, 2265 (1998).

In order to hold an employer directly liable for a co-employee's harassment of another employee, the plaintiff must prove that her employer knew or should have known of the harassment and failed to take prompt remedial action. *Steele*, 867 F.2d at 1316. The corrective action must be reasonably likely to prevent the harassment from recurring. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). An employee can show that the employer knew or should have known of harassment by showing either that she complained to higher management of the problem or that the harassment was so pervasive as to confer constructive knowledge on the part of higher management. *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988).

Some factors for a court to consider in determining whether an employer had constructive knowledge are (1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victim was employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646-47 (11th Cir. 1997). There is insufficient evidence for a reasonable jury to find that Buccaneer had constructive knowledge of any of the harassing incidents. Other than the "bushwa" incident which she discussed with Gilliland, Akers never discussed any of the other three alleged incidents

13

of harassment with anyone in higher management. Those in higher management would not have any reason to have known of these incidents. There was not constant harassment but rather four isolated incidents. There is no allegation that anyone in higher management was present when the alleged harassment occurred. Plaintiff argues that since "bushwa-ing" was a common practice at Buccaneer, the defendant had constructive knowledge of a hostile environment. While this action was clearly inappropriate when directed at Akers, "bushwa-ing" was horseplay among men at Buccaneer. The fact that certain men had engaged in this conduct with each other as horseplay did not give Buccaneer constructive knowledge of a sexually hostile environment before the incident between Hicks and Akers. There is no evidence on the record that Buccaneer knew or should have known, before the incident between Hicks and Akers, that "bushwa-ing" was perpetrated against any females or was creating a sexually hostile environment. Furthermore, there is no evidence that Buccaneer knew or should have known that Hicks sexually harassed females at the plant. Therefore, Buccaneer did not have constructive knowledge of a sexually hostile environment.

Akers also argues that Buccaneer had actual knowledge of the sexual harassment and did not do anything about it. However, of the four instances of sexual harassment which plaintiff alleges, Gilliland only had knowledge of one, the "bushwa" incident. Gilliland became aware of this incident because of an anonymous call six months after the incident. Once Gilliland did find out about it, he promptly moved Hicks to another work area, reprimanded him for the conduct, and told him if this ever happened again he would be fired. Thereafter, Hicks never bothered the plaintiff again.

14

Plaintiff alleges that Kelly is a member of higher management and that he knew about Hicks's harassment of Akers and never took any remedial action. Nunn reported the "bushwa" incident to Kelly and told him that he had counseled Hicks not to bother Akers any more. Subsequently, Hicks never "bushwa-ed" Akers again. Akers never reported to management any further harassment although she claims that one day Hicks threatened to "do you like I did you on that Saturday, and then he slapped [her] on the butt with a piece of molding."[4] (*Id.*). Any imperfection in the investigation was rendered irrelevant because both Nunn and Gilliland took remedial actions to end the harassment, and the harassment ceased. *See Kilgore*, 93 F.3d at 754. Thus, no reasonable jury could find that Buccaneer had actual knowledge of any harassment suffered by the plaintiff and failed to take immediate corrective action. Because Buccaneer did not have actual or constructive knowledge of a sexually hostile environment, it cannot be held directly liable for these incidents.

Buccaneer is likewise not indirectly or vicariously liable for any harassing actions of its employees. Hicks's actions were not done within the scope of his employment since he was attempting to achieve some personal end instead of a purpose authorized by Buccaneer. The same can be said of the comment by Nunn and the drawings and writings of the anonymous employee on the time card. Hicks was not aided in his harassment by the authority given to him because at the time of the harassing incidents, he was not the plaintiff's supervisor. Nunn was plaintiff's supervisor when he made the comment to her. However, Nunn's one comment, taken by itself, clearly does not rise to the level of actionable sexual harassment and thus, it could not

---

[4]It is unclear whether this incident occurred before or after the date on which Nunn reported the "bushwa" incident to Kelly because Akers claims it occurred "several days later." (Akers Dep. at 184).

15

support an imposition of liability upon Buccaneer based on aided-by-agency principles.

Therefore, Buccaneer is not vicariously liable for any sexual harassment of Akers.[5]

Because plaintiff has not shown that she was subjected to quid pro quo harassment or a hostile work environment, Buccaneer is entitled to summary judgment in its favor on plaintiff's sexual harassment claim.

## B. Retaliation

Plaintiff also claims that she was subjected to illegal retaliation for filing an EEOC complaint alleging unlawful sexual harassment. Under Title VII, employees are protected from retaliation for opposition to unlawful employment practices or for making a charge, testifying or participating in any investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. § 2000-3(a). The familiar standards of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), apply to plaintiff's claims of retaliation. In order to present a prima facie claim of retaliation, a plaintiff must demonstrate (1) that she engaged in a statutorily protected activity; (2) that the employer took some adverse employment action against her; and (3) that a causal connection exists between the two. *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992) (citations omitted); *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir. 1989). Further, timing, i.e., the fact that the adverse employment action was taken after the protected activity, is generally insufficient by itself to prove a causal connection to satisfy a prima facie case. *See Boothe v. Birmingham News Co.,* 704 F. Supp. 213, 215-17 (N.D. Ala.), *aff'd,* 864 F.2d 793 (11th Cir. 1988); *cf. Hamm v. Members of Board of Regents,* 708 F.2d 647, 652-54

---

[5]Because this case does not involve harassment by a supervisor, the holding in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), is inapplicable to this case.

(11th Cir. 1983) (holding that plaintiff failed to establish a causal link between her transfer and her

activity even though she was transferred shortly after filing a written complaint with the EEOC).

Assuming a plaintiff can satisfy her prima facie case, a burden of production arises for the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.

*Morgan,* 959 F.2d at 1547. In satisfying this burden:

> [t]he employer's burden of rebuttal is "exceedingly light." Since
> the rebuttal burden is one of production only, the employer "need
> not persuade the court that it was actually motivated by the
> proffered reasons . . . . It is sufficient if the [employer's] evidence
> raises a genuine issue of fact as to whether it discriminated against
> the [employee]."

*Tipton,* 872 F.2d at 1495 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

254-55 (1981)) (alterations in original). Thereafter, the burden shifts to plaintiff to demonstrate

with probative evidence that the employer's articulated reasons for the adverse employment

action are pretextual. *See id.* at 1495.

Plaintiff claims that she was retaliated against for filing an EEOC complaint against

Buccaneer. Since filing an EEOC complaint is protected conduct, plaintiff satisfies the first prong

of the prima facie test. Plaintiff must next demonstrate that she suffered an adverse employment

action. The Eleventh Circuit has held that "Title VII's protection against retaliatory

discrimination extends to actions which fall short of ultimate employment decisions." *Wideman v.*

*Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998). Adverse employment actions

include "demotions, refusals to hire, refusals to promote, and reprimands." *McCabe v. Sharrett,*

12 F.3d 1558, 1563 (11th Cir. 1994). However, the Eleventh Circuit has also noted that "not

'every unkind act' amounts to adverse employment action." *Doe v. Dekalb County Sch. Dist.,*

17

145 F.3d 1441, 1449 (11th Cir. 1998) (citation omitted).

In support of her claim of retaliation, plaintiff argues that fellow employees treated her differently after they learned of her claim. Akers alleges that many people at work were unkind to her and refused to work with her. An employee called plaintiff at home to tell her that she had been the cause of a rule change that required shorts to be of a certain length. Furthermore, she alleges that Nunn was rude to her and teased her about the incident with Hicks. These actions do not rise to the level of adverse employment actions.

Akers argues that "although she did not receive a cut in pay, she was demoted in that she was repeatedly moved to jobs which were unpleasant and degrading." (Pf.'s Br. in Opp. to Summ. J. at 17). Akers specifically cites her assignment to pick up garbage. She alleges that there were other jobs which she could do besides pick up garbage. Akers claims that she was the only employee who was required to go outside the gate and pick up garbage on the street. Plaintiff also contends that her transfer from short molding to molding was retaliatory. She states that while she was pregnant the cleaning women were assigned to the short molding area for the first time. The chemicals made her sick, and Akers was transferred to molding. Plaintiff claims that Nunn would give her difficult jobs and require her to complete extra work.

In support of her claim of retaliation, plaintiff also cites alleged instances of unwarranted reprimands by her superiors at Buccaneer. Akers claims she was reprimanded for leaving the plant without permission even though she previously had been allowed to leave. Plaintiff was reprimanded for standing on the top rung of a ladder. Plaintiff contends that she needed to step on the top to fulfill her employment responsibilities and had asked for a taller ladder to avoid the safety hazard. Akers contends that her reprimand for absences was retaliatory because she had a

18

doctor's excuse for every absence except for two absences, one of which was the day she gave her deposition. Plaintiff was verbally reprimanded on one occasion for smoking instead of doing her job. Akers believes that this action was in retaliation for her sexual harassment claim because other employees who were smoking with her were not reprimanded.

Plaintiff's transfer from short molding to molding was not an adverse employment action, as this was a purely lateral transfer which cannot be considered an adverse employment action. *See Doe*, 145 F.3d at 1449. However, viewing all facts and inferences in the best light to the plaintiff, the job assignments Akers received after she was transferred out of molding, including garbage detail, could be considered adverse employment actions. Furthermore, the reprimands of the plaintiff could also be considered adverse employment actions. Thus, plaintiff has established that Buccaneer took some adverse employment actions against her.

In order to establish the causal relation element of her prima facie case, Akers need only demonstrate "that the protected activity and the adverse action are not completely unrelated." *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994). However, where a substantial period of time has elapsed between the filing of the EEOC charge and the adverse employment action, a causal connection is less likely to exist and a plaintiff must produce some evidence demonstrating a connection between the two events. In other words, the sequence of the two events, by itself, is not enough to create an inference of retaliation. *Leslie v. Mobile Transit Authority*, 963 F. Supp. 1142, 1148-49 (S.D. Ala. 1997); *Breech v. Alabama Power Co.*, 962 F. Supp. 1447, 1461 (S.D. Ala. 1997), *aff'd*, 140 F.3d 1043 (11th Cir. 1998).

In this case, plaintiff filed her EEOC charge in May 1996, at least eight months before she was transferred out of molding and five months before she was given her next reprimand. This

time span is too great to infer a connection between the two without any additional evidence, which plaintiff has not offered. *See, e.g., Leslie*, 963 F. Supp. at 1149 (more than a year is too long to support an inference of causal connection); *Breech*, 962 F. Supp. at 1460 (same); *Balleti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) (elapse of six months between grievance and discharge did not permit inference of causal connection)*; Juarez v. Ameritech Mobile Communications, Inc.*, 746 F. Supp. 798, 804 (N.D. Ill. 1990) (six months between complaint and termination too remote), *aff'd*, 957 F.2d 317 (7th Cir. 1992); *Maldonado v. Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (five months lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action).

Akers continued to work in either molding or short molding until late November 1996, when she reported an injury to her hand. Only then was she transferred to several different jobs, including garbage detail, in order to accommodate her injury. Plaintiff's reprimand for standing on the top rung of the ladder occurred on March 1, 1996, before plaintiff filed an EEOC charge. Thus, this reprimand cannot be considered retaliatory. Plaintiff's next reprimand which she considers retaliatory occurred near the end of September 1996, almost five months after plaintiff filed her EEOC charge. Without additional evidence, this time span is too great to infer a connection between any reprimands plaintiff received after September 1996 and plaintiff's EEOC charge. Because plaintiff has not established a causal connection between the adverse employment actions and the filing of her EEOC complaint, she cannot establish a prima facie case of retaliation.

Assuming that plaintiff could make out a prima facie case of retaliation, her claim still would not survive summary judgment. Buccaneer has given a nondiscriminatory reason for its actions. Akers was assigned to pick up garbage because her hand injury precluded her from fully performing any of the other assignments given to her. Furthermore, plaintiff received reprimands because she had violated company rules.

Plaintiff asserts that the reasons articulated by the defendant for these adverse employment actions are pretext for illegal retaliation. However, plaintiff provides no evidence that her job assignments were retaliatory. Rather, plaintiff states that since she was assigned to "degrading" jobs, the court should infer a retaliatory motive. However, plaintiff filed an EEOC complaint in May of 1996 and worked in either molding or short molding until late November. Plaintiff was only moved when she reported an on-the-job injury, and was then assigned to different positions because her injury kept her from fully performing many of her jobs.

Plaintiff admitted that she had violated company rules which resulted in reprimands. In the case of the verbal reprimand for smoking on the job, her only evidence of retaliation is her subjective view that others who were smoking on the job were not similarly reprimanded. Other than her testimony concerning this particular instance, plaintiff presents no evidence that other employees were not reprimanded for smoking on the job. Except for plaintiff's assumption that her filing of an EEOC complaint and lawsuit was common knowledge at Buccaneer, plaintiff failed to put forth any evidence demonstrating that Jesse Brinkley, the supervisor who reprimanded her for smoking, had any knowledge that Akers had engaged in protected conduct. Akers also cites her reprimand for standing on the top rung of the ladder as evidence of retaliation. Plaintiff claims that she had asked for a taller ladder to fulfill her employment

21

responsibilities and one was not provided for her. However, her supervisor, Nunn, alleges that she requested a smaller ladder because she felt that her ladder was too heavy. Plaintiff also claims that defendant retaliated against her when she was reprimanded for leaving the plant without permission. Plaintiff's only evidence that this reprimand was retaliatory is her assertion that she was never previously reprimanded for leaving the plant during working hours. Plaintiff also argues that the reprimand she received for excessive absences just before she quit was retaliatory. In support of this assertion, Akers states that she had a doctor's excuse for every absence except for two, one of which was the day Akers gave her deposition. However, plaintiff was informed that her reprimand would be retracted if she obtained Family and Medical Leave Act certification for her absences. Akers refused to comply and resigned instead. Akers has provided no further evidence to demonstrate that any of the reprimands which followed her EEOC charge were retaliatory.

Viewing all the evidence in the most favorable light to the plaintiff and drawing all reasonable inferences in her favor, this court finds that no reasonable jury could find that the reasons articulated by the defendant for the actions which plaintiff contends were retaliatory, were pretext for illegal retaliation. Thus, defendant's motion for summary judgment on the plaintiff's retaliation claim is due to be granted.

## C. Assault and Battery

In her complaint, Akers alleges that Hicks's actions constituted assault and battery and that Buccaneer "authorized, ratified and/or condoned" this conduct. (Pl.'s Compl. ¶ 27). In order for Buccaneer to be held liable for the intentional torts of its agent, Hicks, plaintiff must offer evidence "(1) that the agent's wrongful acts were committed in the line and scope of

22

employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts." *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala. 1995).

The actions of Hicks were not committed in the line and scope of employment. Hicks was a molder and these actions had nothing to do with his job. His actions were likewise not committed in furtherance of the business of the employer, as Hicks's actions served no purpose for Buccaneer. Rather, his actions constituted a personal frolic for which Hicks was reprimanded by Gilliland. In addition, Hicks was not Akers's supervisor at the time of the alleged incident, but rather her co-employee. Since Hicks was not plaintiff's supervisor, he was not aided in his harassment by his agency. Thus, Hicks's actions were neither in the line and scope of his employment nor were the actions committed in the furtherance of the business of the employer.

Akers argues that Buccaneer ratified Hicks's actions by not taking prompt remedial action. In order to show ratification, a complaining employee must show that the employer "(1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Id.*

Plaintiff only alleges two instances of conduct which could be considered assault and battery, both of which were perpetrated by Hicks. Plaintiff never reported one incident, and she only told Gilliland about the "bushwa" incident six months after it happened. After Gilliland gained knowledge of the incident, he promptly transferred and reprimanded Hicks for this

23

conduct. Hicks never bothered Akers again after Gilliland's actions. Plaintiff also contends that

Kelly is a member of higher management. However, Kelly did not ratify the actions of Hicks

either. Rather, about a week later, Nunn reported the incident to Kelly and told him that he had

instructed Hicks not to bother Akers anymore. Previously, Kelly did not know about either of the

two incidents of harassment perpetrated by Hicks. Hicks ceased any harassment of Akers.

Therefore, Kelly clearly did not ratify the conduct perpetrated by Hicks. Thus, drawing all

inferences and viewing all facts in the most favorable light to the plaintiff, no reasonable jury

could find that Buccaneer is responsible for an assault or battery upon the plaintiff. Therefore,

summary judgment on plaintiff's assault and battery claim is due to be granted.

## D. Intentional Infliction of Emotional Distress / Tort of Outrage

In her complaint, Akers alleged that "Hicks outrageously and intentionally inflicted

emotional harm upon the plaintiff." (Pl.'s Compl. ¶ 33). To present a jury question for the tort of

outrage, or intentional infliction of emotional distress, Alabama law requires a plaintiff to "present

sufficient evidence that the defendant's conduct (1) was intentional or reckless; (2) was extreme

and outrageous; and (3) caused emotional distress so severe that no reasonable person should be

expected to endure it." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala.

1993). Actionable conduct must be "conduct so outrageous in character and so extreme in degree

as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly

intolerable in a civilized society." *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala.

1980). A plaintiff alleging outrage faces a heavy burden; in only "egregious" cases have the

Alabama courts allowed plaintiffs to even present their claims before juries. *See Ex Parte*

*Crawford & Co.*, 693 So. 2d 458, 459 (Ala. 1997). The Alabama Supreme Court has recognized

24

that jury questions existed as to claims of outrage in three categories of cases:

> 1) cases having to do with wrongful conduct in the context of
> family burials, . . . ; 2) a case where insurance agents employed
> heavy-handed, barbaric means in attempting to coerce the insured
> into settling an insurance claim . . . ; and 3) a case involving
> egregious sexual harassment . . . .

*Ex Parte Crawford & Co.*, 693 So. 2d at 460 n.1 (quoting *Thomas*, 624 So. 2d at 1044) (internal

citations omitted). While this list of three categories may not be exclusive, they certainly form a

benchmark for ascertaining what types of conduct are "extreme and outrageous." None of

Buccaneer's alleged conduct, if true, would fall into the three established categories of outrage

cases. Moreover, the alleged conduct falls well short of the benchmark established by these

categories for extreme and outrageous conduct.

Plaintiff accuses Buccaneer of ratifying the conduct of Hicks and retaliating against her for

filing an EEOC complaint. Plaintiff cites four incidents of sexual harassment. Plaintiff only

reported one of the these incidents, after which the perpetrator was transferred and reprimanded.

Plaintiff claims she was retaliated against because Buccaneer assigned her to jobs that were

degrading and gave her unwarranted reprimands. However, these allegedly degrading job

assignments came over six months after her EEOC charge and were in response to plaintiff's

complaint of an on-the-job injury. Furthermore, plaintiff in fact violated company rules in every

instance in which she was given a reprimand.

Under Alabama law, plaintiff bears a heavy burden because the tort of outrage is

actionable only "in the most egregious circumstances." *Kilgore*, 93 F.3d at 755 (quoting *Thomas*,

624 So.2d at 1044). Akers has failed to set forth the evidence necessary to satisfy the "high

standard with regard to the proof necessary to substantiate an outrage claim." *See Ex parte*

*Mutual Savings Life Ins. Co.*, 698 So. 2d 772, 775 (Ala. 1997); *Ex parte Crawford & Co.*, 693

So. 2d at 461-62. Plaintiff's claim, viewed in the most favorable light to the plaintiff, does not

support a finding of intentional infliction of emotional harm. Therefore, summary judgment on

plaintiff's claim of intentional infliction of emotional harm is due to be granted.

## E. Invasion of Privacy

Under Alabama law, invasion of privacy actually encompasses four distinct "wrongs":

> (1) the intrusion upon the plaintiff's physical solitude or seclusion;
> (2) publicity which violates the ordinary decencies; (3) putting the
> plaintiff in a false but not necessarily defamatory position in the
> public eye; and (4) the appropriation of some element of the
> plaintiff's personality for a commercial use.

*Patterson v. Augat Wiring Sys., Inc.*, 944 F. Supp. 1509, 1522 (M.D. Ala. 1996) (quoting

*Phillips v. Smalley Maintenance Servs., Inc.*, 435 So.2d 705, 708 (Ala. 1983)). FED. R. CIV. P.

8(a) requires claims for relief to contain, *inter alia*, "a short and plain statement of the claim

showing that the pleader is entitled to relief." The Complaint contains no such statement as to

any "false light" or "publicity" claims. Because Alabama law with respect to invasion of privacy

recognizes four *distinct* wrongs, the court concludes that plaintiff has only alleged an intrusion

upon seclusion claim and will address no other invasion of privacy claim. *See Phillips*, 435 So.2d

at 708.

To prevail under an intrusion upon seclusion theory, plaintiff must show "the wrongful

intrusion into one's private activities in such a manner as to outrage or cause mental suffering,

shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495

So.2d 649, 651 (Ala. 1986); *accord Hogin v. Cottingham*, 533 So. 2d 525, 530 (Ala. 1988). To

determine whether an intrusion is so offensive as to be actionable, a court must consider the

26

following factors "(1) whether the subject of the intrusion is information which is private or entitled to be private; (2) the means of intrusion; and (3) the purpose for which the information was obtained." *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1584 (N.D. Ala. 1996) (citing *Hogin*, 533 So. 2d at 531).

Plaintiff makes no allegations which support a claim of invasion of privacy. Plaintiff alleges four instances of sexual harassment. The only incident which she reported resulted in a reprimand and transfer for the person accused. No reasonable jury viewing the facts in the light most favorable to the plaintiff and drawing all inferences in her favor could find that Buccaneer in any way invaded the privacy of Akers. Thus, summary judgment on plaintiff's invasion of privacy claim is due to be granted.

## IV. CONCLUSION

The plaintiff's evidence raises no genuine issues of material fact regarding her claims of sex discrimination, retaliation, assault and battery, invasion of privacy, and intentional infliction of emotional distress. Accordingly, the defendant's motion for summary judgment with respect to these claims is due to be granted. An order granting the defendant's motion for summary judgment will be entered contemporaneously herewith.

DONE this 29th day of March, 1999.

Sharon Lovelace Blackburn

SHARON LOVELACE BLACKBURN
United States District Judge

27